No. 24-2928

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

U.S. NEWS & WORLD REPORT, L.P.,
*Plaintiff-Appellant*,

v.

DAVID CHIU, in his Official Capacity as City Attorney of the City and County of
San Francisco,
*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the
Northern District of California
Case No. 3:24-cv-00395 (Hon. William H. Orrick)

_____

## BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE
## FOR FREEDOM OF THE PRESS, FIRST AMENDMENT COALITION,
## MEDIA LAW RESOURCE CENTER AND NEWS/MEDIA ALLIANCE IN
## SUPPORT OF APPELLANT

_____

Katie Townsend
   *Counsel of Record for Amici
   Curiae*
Gabe Rottman
Mara Gassmann
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1(a), amici state as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Media Law Resource Center has no parent corporation and issues no stock.

News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ...................................................... ii

TABLE OF AUTHORITIES ..................................................................................iv

INTEREST OF AMICI CURIAE .........................................................................1

SOURCE OF AUTHORITY TO FILE ................................................................4

FED. R. APP. P. 29(a)(4)(E) STATEMENT ..........................................................4

SUMMARY OF ARGUMENT ...........................................................................5

ARGUMENT ...................................................................................................7

I.   The District Court erred by failing to give adequate weight to the First
     Amendment issues at stake. ....................................................................7

     A.   The First Amendment prohibits government interference with the
          editorial judgment of private publishers..................................................7

     B.   The City Attorney's subpoenas target non-commercial speech
          entitled to full First Amendment protection. ........................................12

II.  The District Court erred in holding that U.S. News' claims for
     immediate injunctive relief are not ripe and thus not justiciable. .................18

III. The District Court's decision erroneously permits California's anti-
     SLAPP law to be wielded as a sword by government officials......................22

CONCLUSION .................................................................................................23

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS..............................25

CERTIFICATE OF SERVICE.............................................................................26

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967) ........................................................................20

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
    760 F.3d 18 (D.C. Cir. 2014) ..........................................................21

*Bernardo v. Planned Parenthood Fed'n of Am.*,
    115 Cal. App. 4th 322 (2004) ....................................................14, 15

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984) ........................................................................13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ........................................................................14

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
    412 U.S. 94 (1973) ..........................................................................11

*Desnick v. Am. Broad. Cos.*,
    44 F.3d 1345 (7th Cir. 1995) ..........................................................16

*Dex Media West, Inc. v. City of Seattle*,
    696 F.3d 952 (9th Cir. 2012) ..........................................................14

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965) ........................................................................20

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ........................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ........................................................................11

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ........................................................................14

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002) ....................................................................15

*Mary's Kitchen v. City of Orange*,
96 Cal. App. 5th 1009 (2023) ...............................................................24

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974).................................................................*passim*

*Moody v. NetChoice, LLC*,
Nos. 22-277, 22-555, 2024 WL 3237685 (U.S. July 1, 2024).................9, 10, 13

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)............................................................................14

*Neb. Press Ass'n v. Stuart*,
423 U.S. 1327 (1975)..........................................................................22

*Newspaper Guild of Greater Phila., Loc. 10 v. NLRB*,
636 F.2d 550 (D.C. Cir. 1980) .............................................................11

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986).............................................................................11

*Passaic Daily News v. NLRB*,
736 F.2d 1543 (D.C. Cir. 1984) .............................................................9

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973)............................................................................14

*Prager Univ. v. Google LLC*,
951 F.3d 991 (9th Cir. 2020) .........................................................16, 21

*Reno v. Am. C.L. Union*,
521 U.S. 844 (1997).........................................................................11

*Speiser v. Randall*,
357 U.S. 513 (1958)............................................................................22

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)......................................................................21, 22

*U.S. News & World Report, L.P. v. Chiu*,
No. 24-CV-00395-WHO, 2024 WL 2031635
(N.D. Cal. May 7, 2024) .........................................................12, 20, 23

*United States v. Alvarez*,
   567 U.S. 709 (2012) ........................................................................21

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001) ........................................................................14

*Van Nuys Publ'g Co. v. City of Thousand Oaks*,
   5 Cal. 3d 817 (1971) ......................................................................20

*Veilleux v. Nat'l Broad. Co.*,
   206 F.3d 92 (1st Cir. 2000) ...........................................................16

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ........................................................................19

*Wojnarowicz v. Am. Fam. Ass'n*,
   745 F. Supp. 130 (S.D.N.Y. 1990) ...........................................16, 17

**Statutes**

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ..............................................15

Cal. Civ. Proc. Code § 425.16.....................................................6, 23, 24

**Other Authorities**

135 Cong. Rec. H1216–17 (daily ed. Apr. 13, 1989) ...........................16

2 Zechariah Chafee, Government and Mass Communications (1947) ...................10

*About Car and Driver*, Car & Driver,
   https://www.caranddriver.com/about/a41711746/about-us-contact-information-masthead/ ........................................................................18

*About Popular Mechanics*, Popular Mechanics,
   perma.cc/4FVF-K7QV...................................................................18

*About Us*, Healthline,
   perma.cc/982N-8W5A ...................................................................18

Becca Stanek, *Does Invisalign Really Work? Here's What Experts Say*,
   Forbes (Dec. 21, 2023),
   perma.cc/3YPD-KAHY ..................................................................17

*Buy Side*, Wall St. J.,
   https://perma.cc/53V3-K6XP ................................................................. 18

*CNN Underscored*, CNN,
   perma.cc/KU45-AUUS ....................................................................... 18

David Chiu (@DavidChiu), X (June 20, 2023, 4:00PM),
   https://perma.cc/XG2R-MYSB ............................................................ 6

Letter from David Chiu, San Francisco City Attorney, to Eric Gertler,
   Executive Chairman and Chief Executive Officer,
   U.S. News & World Report, L.P. (June 20, 2023),
   perma.cc/JV27-8FE3 ......................................................................... 12

Lucas A. Powe, Jr., The Fourth Estate and the Constitution (1992) ........................ 9

*Policies and Standards*, Wash. Post (July 8, 2024),
   https://www.washingtonpost.com/policies-and-standards/ ................................ 16

Press Release, David Chiu, S.F. City Att'y, U.S. News & World Report
   Faces Legal Scrutiny Over Dubious Hospital Rankings (June 20, 2023),
   perma.cc/K9CS-38AJ ................................................................. 9, 12, 20

Walter S. Mossberg, *Top Products in Two Decades of Tech Reviews*,
   Wall St. J. (Dec. 17, 2013),
   https://www.wsj.com/articles/SB100014240527023048581045792643
   13155801216 ................................................................................. 17

Will Tavlin, *Under Review*, Colum. Journalism Rev. (Oct. 16, 2023),
   perma.cc/5K6Q-9SL7 ........................................................................ 17

*Wirecutter*, N.Y. Times,
   perma.cc/4AT6-GES3 ........................................................................ 17

**INTEREST OF AMICI CURIAE**

Lead amicus the Reporters Committee for Freedom of the Press ("Reporters Committee") is an unincorporated nonprofit association founded by journalists and media lawyers in 1970. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Reporters Committee often appears as amicus curiae in this and other federal courts to underline the importance of editorial independence to the freedom of the press and to address issues impacting journalists, including the scope of the California anti-SLAPP law. *See, e.g.*, Br. of Amici Curiae Reporters Comm. for Freedom of the Press, Am. C.L. Union, et al. in Supp. of Resp'ts, *NetChoice, LLC v. Paxton/Moody v. NetChoice, LLC*, Nos. 22-555, 22-277 (U.S. Dec. 5, 2023); Br. of Amici Curiae Reporters Comm. for Freedom of the Press & Media L. Res. Ctr. in Supp. of Pl.-Appellant, *Twitter, Inc. v. Paxton*, No. 21-15869 (9th Cir. Apr. 11, 2022); Br. of Amici Curiae Reporters Comm. for Freedom of the Press & 33 Media Orgs. in Supp. of Appellees, *CoreCivic, Inc. v. Candide Grp., LLC*, No. 20-17285 (9th Cir. Oct. 26, 2021); Br. of Amici Curiae Reporters Comm. for Freedom of the Press & 27 Media Orgs. in Supp. of Neither Party, *Martinez v. ZoomInfo Techs., Inc.*, No. 22-35305 (9th Cir. Feb. 8, 2024) (en banc). The Reporters Committee is joined here by:

**First Amendment Coalition ("FAC")** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

**The Media Law Resource Center, Inc. ("MLRC")** is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings. The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues. It counts as members over

125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field. The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

**The News/Media Alliance ("N/MA")** represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. N/MA diligently advocates for the rights of its publishers to freely gather and report the news and is active on First Amendment issues concerning a free press.

Amici have a strong interest in preserving legal protections for the editorial independence of journalists and news organizations, including—and perhaps especially—with respect to opinion journalism, where editorial choices by private speakers that are perceived as unfavorable or "biased" by state actors could become the target of government scrutiny or improper enforcement actions.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiff-Appellant and Defendant-Appellee consent to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

Amici submit this brief in support of Plaintiff-Appellant U.S. News & World Report ("U.S. News") to emphasize certain fundamental First Amendment principles—principles reaffirmed by the U.S. Supreme Court just last week in *Moody v. NetChoice*—that are of critical importance to the news media but were not addressed in the District Court's decision. By declining to enter an order enjoining San Francisco City Attorney David Chiu from infringing the editorial autonomy of a publisher, and by allowing him to invoke California's anti-SLAPP law, Cal. Civ. Proc. Code § 425.16, against U.S. News, the District Court's decision poses grave risks to the exercise of First Amendment rights by the press.

The First Amendment "erects a virtually insurmountable barrier" protecting a publisher's exercise of editorial judgment from government interference. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring). That bulwark is of fundamental importance to the news media and, accordingly, to the public that depends on the work of a vigorous, independent press. Through subpoenas to U.S. News, the City Attorney seeks to bypass that constitutional barrier to probe the editorial practices of a news outlet whose editorial choices he disagrees with. *See* David Chiu (@DavidChiu), X (June 20, 2023, 4:00PM), https://perma.cc/XG2R-MYSB (saying U.S. News' hospital rankings "appear to be biased"). But a news organization's decisions about what to publish—and the

5

factors it considers in making those decisions—are core journalistic activities. The methodology a news organization uses to develop reviews or rankings for publication is an exercise of First Amendment-protected editorial discretion; it is not commercial speech. Consequently, the subpoenas at issue sweep well beyond the proper scope of an inquiry aimed at alleged violations of California consumer protection laws.

The District Court's conclusion that U.S. News' claims for injunctive relief are non-justiciable contradicts the routine practice of pre-enforcement intervention by federal courts in cases where First Amendment freedoms are at stake. In light of the chilling effect that official intrusions into the editorial process have on the exercise of First Amendment rights, this case should be treated no differently.

Finally, the City Attorney's invocation of California's anti-SLAPP law against U.S. News is wholly inconsistent with the text and intent of that law. A government official using his subpoena power against a news organization is not a speaker who is being silenced when that news organization seeks to enjoin the enforcement of those subpoenas. U.S. News is entitled to seek judicial intervention to protect its editorial processes from government intrusion and should not be penalized for invoking those First Amendment claims. Indeed, the District Court's grant of costs and fees to the City Attorney would affirmatively diminish

protections for the press against state inquiries into its editorial processes, a deeply perverse result.

For these reasons, amici urge the Court to reverse.

## ARGUMENT

## I. The District Court erred by failing to give adequate weight to the First Amendment issues at stake.

In denying U.S. News' motion for a preliminary injunction and dismissing its Complaint, the District Court's decision disregards the nature of the City Attorney's subpoenas—specifically, that the subpoenas, on their face, target the editorial decisions of a news outlet. As a result, the District Court erred by failing to take the approach that federal courts traditionally apply in the context of pre-enforcement challenges to government actions that would chill non-commercial First Amendment-protected speech.

### A. The First Amendment prohibits government interference with the editorial judgment of private publishers.

In 1974, the Supreme Court unanimously affirmed that the First Amendment forbids governmental interference in the editorial decision-making of the press, holding unconstitutional Florida's "right of reply" statute, which "grant[ed] a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper." *Tornillo*, 418 U.S. at 243. The Court found that any attempt to "[c]ompel[] editors or publishers to publish that which reason tells them

should not be published" would intrude impermissibly on editorial autonomy and violate the First Amendment regardless of motive. *Id.* at 256 (citation and internal quotation marks omitted). This "virtually insurmountable barrier" shielding editorial independence, *id.* at 259 (White, J., concurring), has often been called "absolute," *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557 (D.C. Cir. 1984); *see also* Lucas A. Powe, Jr., The Fourth Estate and the Constitution 277 (1992) ("Because editorial autonomy is indivisible, it must be absolute."). This is so even when the government maintains that its action or rule would ensure balance and improve "the marketplace of ideas." *Moody v. NetChoice, LLC*, Nos. 22-277, 22-555, 2024 WL 3237685, at *16 (U.S. July 1, 2024) ("[T]he Court—in *Tornillo*, in *PG&E*, and again in *Hurley*—held that such an interest could not support the government's effort to alter the speaker's own expression.").

Here, the City Attorney attempts to justify the subpoenas at issue by citing concerns about "bias" in U.S. News' hospital rankings. Press Release, David Chiu, S.F. City Att'y, U.S. News & World Report Faces Legal Scrutiny Over Dubious Hospital Rankings (June 20, 2023), perma.cc/K9CS-38AJ. But whatever validity those concerns do or do not have, *Tornillo* makes clear that editorial fairness— however desirable—"cannot be legislated." 418 U.S. at 256. Thus, the U.S. Supreme Court "has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to

'un-bias' what it thinks biased." *Moody*, 2024 WL 3237685, at \*5. Rather, a foundational precept of the First Amendment is that government must "leave such judgments to speakers and their audiences." *Id.* While this requires that society "take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed," courts recognize it avoids the far graver risk of government censorship. *Tornillo*, 418 U.S. at 260 (White, J., concurring). A contrary approach would "bring[] about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years." *Id.* at 254.

There are consequences of government intrusion in editorial decision-making. First, public discourse "would be blunted or reduced" as editors took "the safe course . . . to avoid controversy." *Id.* at 257. Second, government-enforced editorial fairness would violate "the unexceptionable, but nonetheless timeless" principle "[w]oven into the fabric of the First Amendment" that "liberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." *Id.* at 261 (White, J., concurring) (quoting 2 Zechariah Chafee, Government and Mass Communications 633 (1947)). That fundamental logic—

that the government may not substitute its own editorial viewpoint for a private party's—remains of central importance to the press.[1]

A publisher's freedom to articulate its views "lies at the core of publishing control," a reflection of a news organization's "untrammeled authority to set standards of workmanship that determine its intrinsic excellence and its quality and public character." *Newspaper Guild of Greater Phila., Loc. 10 v. NLRB*, 636 F.2d 550, 560–62, 567 (D.C. Cir. 1980) (MacKinnon, J., concurring). Or as Chief Justice Burger put it in *Tornillo*, a private publisher's power "to advance its own political, social, and economic views" is bound only by "financial success; and . . . the journalistic integrity of its editors and publishers." 418 U.S. at 255 (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 117 (1973) (plurality opinion)).

Under this well-settled law, the City Attorney's subpoenas cannot survive legal scrutiny. Seven of the interrogatories included in the City Attorney's subpoenas, on their face, seek nothing more than to intrude squarely into Plaintiff-Appellant's editorial process. They demand that U.S. News explain the basis for

---

[1] The Supreme Court has since applied the First Amendment protection recognized in *Tornillo* to other forms of communication. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997) (the internet); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (parades); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (private company's billing envelopes).

the claim that its rankings permit consumers to "find the best medical care in 2023," why it factors certain treatments and types of care into its rankings in a certain way, its reasons for not "including measures of health equity" in its rankings, how it uses certain Medicare information, and why it uses opinion surveys as the exclusive method for ranking hospitals in connection with certain specialties. *U.S. News & World Report, L.P. v. Chiu*, No. 24-CV-00395-WHO, 2024 WL 2031635, at *2 (N.D. Cal. May 7, 2024) (quoting Compl. Ex. D); 5-ER-1061–62.

That the City Attorney is seeking to compel U.S. News to provide its "basis" for making certain choices in creating and publishing its rankings underlines the inherent subjectivity in that enterprise and the impropriety of government intrusion into it. U.S. News says its methodology is sound. Br. for Appellant at 8; *see also* 4-ER-709–883; 5-ER-886–955. The City Attorney apparently disagrees; he has claimed that the absence of, among other things, "health equity" as a factor that U.S. News takes into account renders its methodology unreliable. *See* 2-ER-269; *see also* Letter from David Chiu, San Francisco City Attorney, to Eric Gertler, Executive Chairman and Chief Executive Officer, U.S. News & World Report, L.P. (June 20, 2023), perma.cc/JV27-8FE3 (stating that U.S. News' hospital rankings "suffer from poor and opaque methodology"); Press Release, *supra* (rankings "appear to be biased towards

providing treatment for wealthy, white patients, to the detriment of poorer, sicker, or more diverse populations"). But as the *Moody* Court recently observed, "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody*, 2024 WL 3237685, at \*16. In seeking "its own conception of speech nirvana," the City here has impermissibly moved the parties' disagreement from the realm of public debate into the realm of state power.

The subpoenas at issue, which arise from the City Attorney's dislike of the methodology that U.S. News has chosen to use to formulate its hospital rankings, thus implicate fundamental—and vital—First Amendment protections against government interference in the editorial process. In failing to consider those constitutional implications, the District Court erred.

**B. The City Attorney's subpoenas target non-commercial speech entitled to full First Amendment protection.**

Reviews and rankings, and the methodology underlying them, are entitled to full First Amendment protection. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 488 (1984). To apply less-protective commercial speech doctrine to government attempts to intrude into the editorial process that underlies such journalism would open the door to direct state intervention in public discourse in the name of consumer protection.

12

Commercial speech is confined to "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). It is "usually defined as speech that does no more than propose a commercial transaction." *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App. 4th 322, 343 (2004) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).[2] Simply put, a news outlet endeavoring to investigate, assess, and review or rank products *sold by others* is engaged in non-commercial speech, and statements about the relative quality or reliability of its rankings are likewise non-commercial, even if the public's perception of their reliability could induce sales. Further, under California law, for speech to be analyzed as commercial under the Unfair Competition Law ("UCL"), the speech must "*consist of factual representations* about the business operations,

---

[2]     The fact that a publisher has multiple grounds for publishing, some of them commercial and some not, does not diminish their First Amendment rights. *See id.*; *see also, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is as immaterial . . . as is the fact that newspapers and books are sold."); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (holding that "profit motive" cannot "somehow strip communications of the otherwise available" First Amendment protections); *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) (finding Yellow Pages to be non-commercial speech subject to full First Amendment protection because economic motive alone is insufficient to make a publication commercial speech). Were it otherwise, any state action targeted at the editorial activities of a news organization would receive lesser scrutiny as a commercial speech regulation. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

products, or services of the speaker." *Bernardo*, 115 Cal. App. 4th at 347 (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 962 (2002)) (opinions not actionable under the UCL).

Here, the City Attorney seeks to commandeer a statute meant to regulate advertising and commercial activity to investigate U.S. News' editorial choices. *See* Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; *see also Bernardo*, 115 Cal. App. 4th at 347–48 (declining to regulate Planned Parenthood's speech under unfair competition and false advertising statutes although speech might have spurred patients for clinics).

In its briefing below, the City Attorney attempted to justify those intrusions into U.S. News' decision-making processes by arguing that because U.S. News accepts advertising from ranked hospitals, the rankings themselves, and U.S. News' claims as to the reliability and trustworthiness of those rankings, are commercial speech subject to regulation under the UCL.  2-ER-287–88.  But how U.S. News researches and formulates its rankings are core editorial functions; such non-commercial speech is entitled to full First Amendment protection.

To treat U.S. News' hospital rankings, its methodology for formulating those rankings, and its public statements about the reliability of that methodology as commercial speech would invite similar government investigative and enforcement actions based on any news organization's claims about how it adheres to its own

14

editorial standards. For instance, news organizations aspire to provide coverage that is objective, but "arguments about objectivity are endless." *Policies and Standards*, Wash. Post (July 8, 2024), https://www.washingtonpost.com/policies-and-standards/. For just that reason, federal courts have routinely concluded that representations about how reporting will be conducted cannot be enforced through the law of fraud or contract without posing a grave threat to the exercise of First Amendment rights. *See, e.g.*, *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 121–23 (1st Cir. 2000); *Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1354–55 (7th Cir. 1995); *see also Prager Univ. v. Google LLC*, 951 F.3d 991, 999–1000 (9th Cir. 2020) (concluding that statements related to YouTube's content moderation standards are not commercial speech under Lanham Act).

Indeed, the courts and Congress have recognized as much in the false advertising context, specifically with respect to consumer recommendations made by news organizations. In extending the Lanham Act to product disparagement, Congress sought to avoid "free speech concerns" by excluding publications "such as a Consumer Report which reviews and may disparage the quality . . . of products." *See Wojnarowicz v. Am. Fam. Ass'n*, 745 F. Supp. 130, 142 (S.D.N.Y. 1990) (quoting 135 Cong. Rec. H1216–17 (daily ed. Apr. 13, 1989) (statement of Rep. Kastenmeier)). That law "has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not

engaged in marketing or promoting a competitive product or service." *Id.* at 141–42 (citing cases). By claiming authority under California consumer protection law to regulate U.S. News' hospital rankings on the ground they are commercial speech entitled to lesser First Amendment protection, the City Attorney would stifle the flow of valuable information to the public.

The District Court's ruling will embolden the government in pursuing this kind of extraordinary investigation and resulting litigation—an outcome that may have broadly felt consequences. Many (if not most) news organizations offer some form of review or recommendation for products or services. *See generally* Will Tavlin, *Under Review*, Colum. Journalism Rev. (Oct. 16, 2023), perma.cc/5K6Q-9SL7 (surveying history and current state of "service journalism"). Similar to reviews of restaurants and movies, product and service reviews, including rankings, are staple parts of news organizations' coverage. *See, e.g.*, Walter S. Mossberg, *Top Products in Two Decades of Tech Reviews*, Wall St. J. (Dec. 17, 2013), https://www.wsj.com/articles/SB100014240527023048581045792643 13155801216; Becca Stanek, *Does Invisalign Really Work? Here's What Experts Say*, Forbes (Dec. 21, 2023), perma.cc/3YPD-KAHY. Indeed, some news outlets have become destinations for their product and service reviews. *See, e.g.*, *Wirecutter*, N.Y. Times, https://www.nytimes.com/wirecutter/about/ ("Wirecutter is the product recommendation service from The New York Times. . . . Whether

it's finding great products or discovering helpful advice, we'll help you get it right (the first time)."); *Buy Side*, Wall St. J., https://perma.cc/53V3-K6XP ("Buy Side from WSJ . . . [is] committed to selecting products and services to improve your daily life with thoroughly researched recommendations[.]"); *About Popular Mechanics*, Popular Mechanics (122-year-old magazine serving as a leading provider of product reviews and consumer information); *About Car and Driver*, Car & Driver, https://www.caranddriver.com/about/a41711746/about-us-contact-information-masthead/ ("a print and digital magazine covering the newest car offerings, showcasing car culture, and helping people shopping for a car by serving up our unique brand of intelligence, independence, and irreverence"); *About Us*, Healthline, perma.cc/982N-8W5A (popular health news website offering original content and product reviews); *CNN Underscored*, CNN, perma.cc/KU45-AUUS (CNN's product and service review page).

To be sure, the protection of consumers is a legitimate state interest. But regardless of "how beneficent-sounding the purposes of controlling the press might be, we prefer the power of reason as applied through public discussion and remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." *Tornillo*, 418 U.S. at 259 (White, J., concurring) (citation and internal quotation marks omitted). Repackaging a difference of opinion between a government official and news

17

outlet over editorial choices as a violation of consumer protection laws carries the acute risk that states will use such laws to sway public discourse in their favor—and undercut the independence the First Amendment was enacted to protect.

Accordingly, the speech by U.S. News that is targeted by the City Attorney is non-commercial speech entitled to full constitutional protection, and the First Amendment precludes the government from the sort of interference that the City attempts here.

## II. The District Court erred in holding that U.S. News' claims for immediate injunctive relief are not ripe and thus not justiciable.

The District Court failed to take into account the concrete First Amendment harms flowing from the City Attorney's issuance of the subpoenas at issue when it concluded that U.S. News' claims were not ripe; it therefore declined to address the substance of U.S. News' claims. That was error. The City Attorney's investigation is predicated on U.S. News' exercise of editorial judgment. Such an investigation, which threatens retaliation against a publication for constitutionally protected speech, inflicts a "harm that can be realized even without an actual prosecution." *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). That chilling effect on "free expression—of transcendent value to all society, and not merely to those exercising their rights," warrants immediate consideration of the merits of U.S. News' claim for injunctive relief. *Van Nuys*

18

*Publ'g Co. v. City of Thousand Oaks*, 5 Cal. 3d 817, 828–29 (1971) (quoting

*Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)).

U.S. News' claim is ripe under a traditional application of *Abbott*

*Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). The question whether the

government can intrude upon a publisher's exercise of editorial discretion is

"purely legal," *id.* at 149, and the answer is well-settled: It cannot. And there is no

further factual development necessary to conclude that the City Attorney's

investigation is predicated on protected editorial choices. First, the City Attorney

has said as much. Press Release, *supra* (explaining that the investigative demands

were motivated in part by the City Attorney's perception that U.S. News' rankings

"appear to be biased towards providing treatment for wealthy, white patients, to the

detriment of poorer, sicker, or more diverse populations"). Second, it is clear from

the subpoenas themselves. The interrogatories demand information about the basis

for U.S. News' claim that its rankings permit consumers to "find the best medical

care in 2023," why it factors certain treatments and types of care into its rankings

in a certain way, its reasons for not "including measures of health equity" in its

rankings, how it uses certain Medicare information, and why it uses opinion

surveys as the exclusive method for ranking hospitals in connection with certain

specialties—*i.e.*, U.S. News' editorial choices. *U.S. News & World Report*, 2024

WL 2031635, at *2 (quoting Compl. Ex. D); 5-ER-1061–62.

U.S. News' statements about its editorial standards are entitled to full First Amendment protection. *See Prager Univ.*, 951 F.3d at 999–1000 ("YouTube's statements concerning its content moderation policies do not constitute 'commercial advertising or promotion[.]' . . . The statements [at issue] were made to explain a user tool, not for a promotional purpose[.]"). And because its standards are not commercial speech, any further factual development to determine whether U.S. News' representations about editorial fairness are false would be constitutionally irrelevant no matter what the City Attorney's investigation ultimately revealed. *See United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality opinion) (noting that misleading *non*commercial speech, unlike false commercial speech, enjoys First Amendment protection); *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (holding that a pre-enforcement challenge to a statute proscribing false election speech was "purely legal, and [would] not be clarified by further factual development" (citation omitted)). Simply put, the City Attorney's purported interest in exposing hidden "bias" in a publisher's exercise of editorial discretion is not, as a matter of law, a legitimate one, and no amount of discovery can rescue it. *Cf. Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 32 (D.C. Cir. 2014) (Kavanaugh, J., concurring) (noting that compelled disclosure of "the political affiliation of a business's owners" would violate the First Amendment).

Meanwhile, the harms inflicted by the issuance of the subpoenas are both immediate and irrevocable. Under the District Court's ruling, a news organization must wait and wonder during the pendency of any purported investigation targeting its speech—the sword of Damocles hanging over its head—in order to seek relief from the courts. But "each passing day" that the exercise of First Amendment rights is burdened inflicts irrevocable harm. *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975).

Indeed, the Supreme Court has recognized the practical hardships that attend compliance with speech-burdening government investigations or proceedings, including the "diver[sion of] significant time and resources to hire legal counsel and respond to discovery requests." *Driehaus*, 573 U.S. at 165 (holding that credible threat of criminal prosecution presented grounds for standing and noting the significant burden of "threatened [administrative] proceedings" alone). And, even where a publisher's conduct is unimpeachable, "[t]he man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526 (1958). Simply put, each day the City Attorney's demands hang in the air, "legitimate utterance[s] [are] penalized." *Id.* This immediate chilling effect—which extends to any speech that might provoke an intrusive government investigation—is being felt now, not only by U.S. News, but by other media outlets

as well.  There is no justification for depriving U.S. News of any recourse in the courts when the subpoenas at issue impermissibly target its lawful, constitutionally protected speech.

**III.  The District Court's decision erroneously permits California's anti-SLAPP law to be wielded as a sword by government officials.**

The District Court's order also misapplies California's anti-SLAPP law, Cal. Civ. Proc. Code § 425.16.  In contravention of the law's stated purpose to safeguard the "valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" from the chilling effect of non-meritorious litigation against the press and other speakers, Cal. Civ. Proc. Code § 425.16(a), the District Court applied it to award attorney's fees and costs to the City Attorney—a government official acting in his official capacity—arising from U.S. News' challenge to the City Attorney's subpoenas on First Amendment grounds. *U.S. News & World Report*, 2024 WL 2031635, at *16–20.

When California enacted its anti-SLAPP statute in 1992, the California Legislature recognized "that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process."  Cal. Civ. Proc. Code § 425.16(a).  To permit a government official to invoke that law in response to a First Amendment challenge by a news outlet—one of the types of speakers the

statute was enacted expressly to protect, *id.*—to subpoenas issued by that government official would turn the purpose of the law on its head.

The District Court's analysis ignores the intent of the anti-SLAPP statute and relies largely on caselaw arising in the defamation context, where courts have reached the noncontroversial conclusion, consistent with the law's purpose, that the government should be able to issue statements and explain its actions without fear of unmeritorious libel suits. But none of the cases relied upon by the District Court supports application of the law to an action brought by a news outlet challenging the issuance of subpoenas that it contends infringe its First Amendment rights. And, to be clear, U.S. News does not assert a claim for defamation—or any other speech-suppressive tort—nor is there any dispute that the mere issuance of the subpoenas is the purported protected activity upon which the District Court based its order awarding attorney's fees and costs to the City Attorney. The California anti-SLAPP statute cannot be deployed to protect "govern[ment] action"—not speech—from constitutional challenge. *See Mary's Kitchen v. City of Orange*, 96 Cal. App. 5th 1009, 1017 (2023) (California anti-SLAPP statute did not apply to a claim that a city council had improperly taken action during closed council session without noting that matter on the agenda).

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to reverse.

Dated: July 9, 2024

Respectfully submitted,

*/s/ Katie Townsend*
Katie Townsend
   *Counsel for Amici Curiae*
Gabe Rottman
Mara Gassmann
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** 24-2928 _____

I am the attorney for amici curiae the Reporters Committee for Freedom of the Press, First Amendment Coalition, Media Law Resource Center, and News/Media Alliance.

**This brief contains 4,408 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** __/s/ Katie Townsend_____ **Date:** July 9, 2024

## CERTIFICATE OF SERVICE

I, Katie Townsend, do hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system on July 9, 2024.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 9, 2024

/s/ Katie Townsend
Katie Townsend
*Counsel of Record for Amici Curiae*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS