No. 24-2928

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

U.S. NEWS & WORLD REPORT, L.P.,

*Plaintiff-Appellant*

v.

DAVID CHIU, in his Official Capacity as City Attorney of the City
and County of San Francisco,

*Defendant-Appellee*

On Appeal from the United States District Court
for the Northern District of California
No. 3:24-cv-00395-WHO
Hon. William Orrick

_____

*AMICI CURIAE* **BRIEF OF DOCTORS AND MEDICAL PROFESSIONALS
IN SUPPORT OF APPELLEE AND AFFIRMANCE**

_____

RYAN P. MCGINLEY-STEMPEL
IMRAN M. DAR
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
(415) 848-7200

rmcginleystempel@publiclawgroup.com
idar@publiclawgroup.com

Attorneys for *Amici Curiae* Doctors and Medical Professionals

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF CONSENT ............................................................ iv

STATEMENT REGARDING AUTHORING OF BRIEF ...................................... v

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................... 1

I.     INTRODUCTION ............................................................... 5

II.    ARGUMENT.................................................................... 7

    A.   USNWR's Rankings Are Opaque and Distort Hospital
       Priorities. ................................................................7

    B.   There Are Shortcomings in USNWR's Methodology That
       Mislead Consumers. .......................................................11

       1.   There Are Significant Inaccuracies in USNWR's Quality
          of Care Assessments. .................................................11

       2.   USNWR's Methodology for Assessing Quality of Care
          Reflects and Perpetuates Racial Inequities in Healthcare.........14

    C.   The City Attorney's Subpoenas Serve a Vital Public Interest. ...........17

III.   CONCLUSION.................................................................. 22

Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6................. 23

Form 8. Certificate of Compliance for Briefs.......................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blue v. Office of Inspector General*,
 23 Cal. App. 5th 138 (Ct. App. 2018) .................................................20

*Brown v. Crandall*,
 198 Cal. App. 4th 1 (Ct. App. 2011) ...................................................18

*Connecticut Indem. Co. v. Superior Court*,
 3 P.3d 868 (Cal. 2000) .........................................................................18

*Craib v. Bulmash*,
 777 P.2d 1120 (Cal. 1989) ...................................................................22

*Iloh v. Regents of University of California*,
 94 Cal. App. 5th 947 (Ct. App. 2023) ...........................................19, 20

*Kirchmeyer v. Helios Psychiatry Inc.*,
 89 Cal. App. 5th 352 (Ct. App. 2023) .................................................19

*Reich v. Montana Sulphur & Chemical Co.*,
 32 F.3d 440 (9th Cir. 1994) .................................................................22

*Rivera v. First DataBank, Inc.*,
 187 Cal. App. 4th 709 (Ct. App. 2010) ...............................................18

*U.S. v. Morton Salt Co.*,
 338 U.S. 632 (1950) .............................................................................21

*Vargas v. City of Salinas*,
 205 P.3d 207 (Cal. 2009) ...............................................................20, 21

**Statutes**

California Business & Professions Code
 § 17200 ...................................................................................................6
 § 17208 .................................................................................................18

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

California Code of Civil Procedure
§ 425.16.................................................................................6

**Articles**

*An Analysis of the US News & World Report Methodology for
Attribution of Specialty Care in Otolaryngology and Urology*, 164
Otolaryngology–Head and Neck Surgery No. 2 (2020).....................................14

*Fatally Flawed—Making Sense of US News & World Report
Mortality Scores*, 147 JAMA Otolaryngol Head Neck Surg. No. 4
(2021).................................................................................14

*Patient Misattribution Influences US News and World Report Ranking
Metrics*, 11 Urology Practice No. 4 (2024) .............................................11, 1213

*It's Time For US Hospitals To Withdraw From The US News And
World Report Rankings*, Health Affairs Forefront, (Mar. 17, 2023)......15, 16, 17

*Methodology, U.S. News & World Report 2023-2024 Best Hospitals:
Procedures & Conditions Ratings* (2023) ......................................................9, 11

*Campaign Reform for US News and World Report Rankings*, 158
Journal of American Medical Association Surgery No. 2, 114-15
(2022).................................................................................8

*U.S. News & World Report Urology Specialty Rankings Do Not
Assess the Majority of Urologic Care*, 211 Journal *of Urology*
No. 3, 469-471 (2023)...............................................................12

## STATEMENT OF CONSENT

Pursuant to Federal Rule of Appellate Procedure 29(a), Counsel for *Amici Curiae* hereby state that this brief is being filed based on the consent of all parties.

DATED:  August 19, 2024

Respectfully submitted,

By:  /s/Imran M. Dar

IMRAN M. DAR
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
(415) 848-7200
idar@publiclawgroup.com

*Counsel for Counsel for Doctors
and Medical Professionals*

## STATEMENT REGARDING AUTHORING OF BRIEF

### Federal Rules of Appellate Procedure 29(a)(4)(E), Rule 32

*Amici Curiae* certify that no counsel for any party authored this brief in whole

or in part, no party or party's counsel contributed money that was intended to fund

preparation or submission of the brief, and no persons other than *Amici Curiae*

contributed money that was intended to fund preparation or submission of the

brief.

DATED:  August 19, 2024

Respectfully submitted,

By:  /s/Imran M. Dar

IMRAN M. DAR
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
(415) 848-7200
idar@publiclawgroup.com

*Counsel for Counsel for Doctors*
*and Medical Professionals*

## IDENTITY AND INTEREST OF *AMICI CURIAE*

**Dr. Christopher Saigal MD, MPH,** is Professor and Executive Vice Chair of Urology at the UCLA School of Medicine. He has been active as a physician leader at UCLA since 2001, leading efforts within the system to improve medical decision making, describe new approaches to measuring the costs of care, and introduce new techniques to incorporate the patient's voice into service line redesign. Dr Saigal's major research area is in shared decision making. He has been funded by an R-01 from the National Cancer Institute to innovate new approaches to shared decision making in men with prostate cancer. Dr Saigal was the Rand Principal Investigator of the Urological Diseases America ("UDA") project, a $25 million, 15-year National Institutes of Health ("NIH")-funded effort to characterize quality, cost, and access to urologic care in the U.S. He received a $2.1 million Patient-Centered Outcomes Research Institute ("PCORI") award to employ implementation science methods to understand how best to scale effective shared decision-making interventions.

He has published over 140 policy and quality of care related manuscripts and two comprehensive compendia about utilization of health care services in urology.

**Dr. Mark Litwin MD, MPH,** is Distinguished Professor of Urology, Health Policy & Management, and Nursing at UCLA, where he serves as Chair of the

Department of Urology. Dr. Litwin holds a Bachelor's Degree in Economics from Duke University and an MD from Emory University. He trained in urology at Harvard Medical School's Brigham and Women's Hospital. He was a Robert Wood Johnson Clinical Scholar at RAND and UCLA, where he earned his MPH. He is a translational population scientist who has authored original articles, reports, reviews, books, and book chapters in urologic oncology and health services research. Dr. Litwin published the first validated quality-of-life instrument to track outcomes in men with prostate cancer and has been an international leader in this area. Dr. Litwin's research includes medical outcomes assessment, quality of care, health-related quality of life, epidemiology, costs and resource utilization, patient preferences, access, and value for malignant and benign diseases in urology.

His work has been funded by the National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK"), the National Cancer Institute ("NCI"), Department of Defense ("DoD"), American Cancer Society, California Department of Public Health, and other organizations. He has been continuously NIH-funded since 1997. His current grants include a $130 million state-funded program involving prostate cancer care for low-income uninsured men in California, established in 2001; a T32 training grant in outcomes research in urologic and gynecologic oncology; a DoD grant to optimize the graphical display of outcomes data for patients; an American Cancer Society grant to study the experience of low-

income patients enrolling in Affordable Care Act ("ACA")-based health insurance; and a Movember-funded international registry of prostate cancer outcomes. For 14 years he led Urologic Diseases in America, a $24 million epidemiologic study funded by the NIDDK. He teaches in UCLA's Schools of Medicine, Public Health, and Nursing and practices urologic oncology at UCLA.

**Dr. Kathy Huen, MD, MPH,** is Assistant Clinical Professor of Urology at the David Geffen School of Medicine at UCLA. Dr. Huen earned her undergraduate degree from Brown University and her medical doctorate from Emory University School of Medicine. She completed her urology residency training at UCLA, and her pediatric urology fellowship at Orange County/UC Irvine prior to joining the faculty at UCLA.

Since November 2022, Dr. Huen has served as the Quality Officer of the Department of Urology, and since May 2024, serves as a Senior Quality Officer of UCLA Health. She is leading efforts to reduce unnecessary emergency room visits in post-operative urological patients. She has published over 20 peer-reviewed manuscripts.

**Dr. Chinenyenwa Mpamaugo, MD, MPH,** attended the University of Pittsburgh School of Medicine, where she received her MD, and the University of Pittsburgh School of Public Health, where she received her MPH. She then went

on to complete her pediatric residency at the University of Washington/Seattle Children's Hospital.

She is currently a clinical instructor in the division of Seattle Children's Hospital. She is currently a clinical instructor in the division of Hospital Medicine and Locum Pediatric Hospitalist.

**Dr. Madeline Wozniak, MD,** is a board-certified pediatrician. She obtained an undergraduate degree in Neuroscience from Brown University. She earned her medical degree from the Warren Alpert Medical School of Brown University, graduating as a member of the Alpha Omega Honor Society. She completed pediatric residency at the University of Washington/Seattle Children's Hospital and was a member of the Resident Education in Advocacy and Child Health track. She currently works as a Pediatric Critical Care Medicine Hospitalist.

***Interest of Amici Curiae.*** Central to this case is the question whether the City Attorney's investigation into U.S. News & World Report's ("USNWR") methodology for ranking hospitals serves an appreciable public interest. USNWR hospital rankings have a substantial influence on in many Americans' selections of in-patient hospital treatment. As doctors and medical professionals, *Amici Curiae* have concerns about USNWR's methodology for ranking hospitals and the potentially harmful effects the rankings have on consumers and hospitals. As such, there is strong public interest in ensuring that the City Attorney's investigation

4

proceeds, so that the details and implications of USNWR's methodology can be brought to light, understood, and accorded the proper weight in consumers' healthcare decisions.

## I.   INTRODUCTION

USNWR is a media company that presents itself and is seen by many as an authoritative source of consumer information.  It produces rankings regarding the quality of care at hospitals nationwide with its "Best Hospital" rankings.  It claims that these rankings are reliable and objective and are "a valuable and trusted resource for the public" that "recognize excellent healthcare facilities and inform the public about hospitals' relative strengths."  Dkt. 11.1 at 19–20.  The rankings have significant influence over consumers' selection of medical care.  The weight the healthcare industry and consumers place on them also has a large effect on how hospitals allocate their resources.

*Amici Curiae* and other experts in the medical field have serious concerns regarding apparent inaccuracies and inequities in USNWR's methodology for ranking hospitals.  If proved true, such inaccuracies and inequities indicate that USNWR's rankings tend to mislead consumers and distort hospital priorities.  However, USNWR's methodology is far from transparent, so much so that it is practically impossible to replicate its rankings or even understand how it comes to its results.

5

The San Francisco City Attorney ("City Attorney") shares *Amici Curiae's* concerns about USNWR's representations about its rankings and financial relationships that the media company has with the hospitals it purports to neutrally evaluate. Believing that there may be a potential violation of the Unfair Competition Law—which prohibits unfair, unlawful, and deceptive business acts or practices (*see* Cal. Bus. & Prof. Code § 17200 et seq.)—he served administrative subpoenas on USNWR on January 9, 2024, requesting information about rankings and the payments USNWR receives from hospitals, leading to the instant action.

Rather than complying with the subpoenas or objecting to them under the procedure set forth by California law, USNWR filed an action in District Court seeking a preliminary injunction against the City Attorney. The City Attorney moved to dismiss USNWR's action, in part, on the grounds that its state law claims were subject to California's law prohibiting anti-strategic lawsuits against public participation ("Anti-SLAPP") (*see* Cal. Code Civ. Proc. § 425.16), and that an injunction was not in the public interest.

The District Court granted the City Attorney's motion. Central to its holding was a determination that the City Attorney's subpoenas were an important issue of public interest. It ruled that USNWR's state-law claims should be stricken because the dispute between the City Attorney and USNWR concerned "a public issue that

6

is a matter of public interest." 1-ER-32–33. With respect to an injunction, the court held that the public interest in having one issue was neutral and was "best served by having the parties proceed through the state-sanctioned process for determining whether [the] subpoenas are enforceable." 1-ER-35.

This Court should affirm. The City Attorney's investigation must be permitted to proceed to (i) illuminate the full scope and implications of the inaccuracies and inequities within USNWR's methodology, and (ii) protect consumers and hospitals from the risks associated with making serious decisions regarding health and welfare—sometimes life or death decisions—based on potentially misleading information.

## II. ARGUMENT

### A. USNWR's Rankings Are Opaque and Distort Hospital Priorities.

USNWR acknowledges that its hospital rankings are viewed by many in the healthcare sector as "a valuable and trusted resource for the public." Dkt. 11.1 at 20. Indeed, it claims that its rankings are a powerful tool for consumers regarding how to find and select sources of in-patient care. And that is true, so much so that USNWR has a disclaimer on its website that its rankings "'should be taken as a starting point' and '[a]ll care decisions should be made in conjunction with medical professionals.'" *Id.* at 19.

None of that is lost on hospitals, which obviously want patients to select them as providers of medical care. The importance placed on the USNWR rankings incentivizes hospitals to "teach to the test"—that is, take actions that optimize their standing in with USNWR but which may not actually benefit patients. *See* Timothy Daskivich & Bruce Gewertz, *Campaign Reform for US News and World Report Rankings*, 158 Journal of American Medical Association Surgery No. 2, 114–15 (2022).[1] Indeed, hospitals spend a great deal of time and energy fine-tuning how they report data to USNWR in the hopes that it will enhance their ranking. That would not be concerning if the rankings were in fact a reliable indicator of the quality of care provided at hospitals. But as discussed below, it's far from clear that is the case.

A significant problem with USNWR's rankings is the opacity of its methodology. The company claims to be transparent and publishes an annual report for its methodology underlying each of its Best Hospital rankings. However, the reports do not actually provide sufficient information to explain how USNWR arrives at its results. For example, the reports state where USNWR acquires its data (such as "Medicare Beneficiary Summary Files," the "American Hospital Association [] Annual Survey," and "Orthopedic Board Certification

---

[1] Available at: https://jamanetwork.com/journals/jamasurgery/article-abstract/2798639?utm_campaign=articlePDF&utm_medium=articlePDFlink&utm_source=articlePDF&utm_content=jamasurg.2022.4511.

Data") but does not provide any more detail about the specific data it relied on to produce its rankings. *See* Methodology, U.S. News & World Report 2023-2024 Best Hospitals: Procedures & Conditions Ratings at 8–9 (2023).[2] Another problem is that, in the reports, USNWR states that the rankings adjusted for differences in "case mix" between hospitals—a metric that reflects the diversity, complexity, and severity of the patients treated at a hospital—but does not explain exactly *how* it accounted for this case mix. *See* Methodology, U.S. News & World Report 2023-2024 Best Hospitals: Procedures & Conditions Ratings at 24.

It is almost impossible for hospitals to understand how they are being ranked. Indeed, the reports do not provide the level of detail that hospitals need to reproduce USNWR's results. For the hospitals themselves, separate from the methodology reports, USNWR does not explain how exactly individual hospital scores are calculated. The metrics it provides are simply black boxes. For example, the "expert opinion" component that factors into a hospital's individual ranking is purportedly based on survey data, but USNWR neither explains how the surveys are filled out nor by whom they are answered. There is also a reputation score given to each hospital which factors into its overall ranking, but similarly, USNWR does not tell hospitals who was surveyed to produce it or how it is

---

[2] Available at: https://health.usnews.com/media/best-hospitals/BHPC-Methodology-2023-2024.

calculated. As a result, hospitals are left guessing about why they received the scores they received. This greatly diminishes the utility of the scores for the purposes of troubleshooting and improving hospital performance. It also forces hospitals to allocate inordinate resources towards trying to simulate what they can of USNWR's methodology to predict and optimize their scores for next year's ranking.

USNWR's lack of transparency would be less concerning if there were no reason to doubt the accuracy or equity of USNWR's methodology. Consumers could put their trust in USNWR's rankings without worrying about how exactly the rankings are determined, and hospitals could be confident that an improvement in their standing in USNWR's rankings is indicative of an improvement in the quality of care provided to their patients. This would be true, even with the flaws in USNWR's methodology identified below because consumers and hospitals could make informed decisions with full awareness of the rankings shortcomings. However, as it stands, USNWR's methodology is neither sufficiently transparent nor sufficiently accurate and equitable.

**B.** **There Are Shortcomings in USNWR's Methodology That Mislead Consumers.**

    **1.** **There Are Significant Inaccuracies in USNWR's Quality of Care Assessments.**

USNWR evaluates the quality of hospital specialties or "lines of service" (e.g., urology, geriatrics, orthopedics, etc.) based on performance across three core domains: structure, process, and outcomes. *See* Methodology, U.S. News & World Report 2023-2024 Best Hospitals: Procedures & Conditions Ratings at 8. "Structure" refers to a hospital's resources related to patient care (for example, nursing ratios, specialized clinics, or technologies, etc.). *See id.* "Process" encompasses the overall rendering of diagnosis, treatment, prevention, and patient education. *See id.* "Outcomes" refers to the actual results patients' experience (for example, mortality and discharge to home rates). *See id.*

For many specialties, the "outcomes" component constitutes the most weighted component of the hospital's final score in that specialty. *See* Kathy H. Huen, Mark S. Litwin & Christopher Saigal, *Patient Misattribution Influences US News and World Report Ranking Metrics*, 11 Urology Practice No. 4, 625 (2024).[3] The "outcomes" component comprises two measures derived from Medicare claims-based data: 30-day mortality and discharging patients to home—the rate

---

[3]Available at: https://www.auajournals.org/doi/10.1097/UPJ.0000000000000578.

patients go home directly after inpatient care rather than being transferred to another facility for continued care. *Id.*

In general, "claims-based" methods for attributing patients to a particular line of service or specialty tend to generate errors. *See*, *supra*, *Patient Misattribution Influences US News and World Report Ranking Metrics* at 625. Moreover, relying solely on Medicare claims to evaluate outcomes artificially constrains USNWR's dataset by excluding outcomes for patients who are not Medicare beneficiaries and are younger than 65 years old. Naturally, assessment of outcomes for patients in a particular specialty depends on how one defines the set of patients that fall under that specialty, i.e., the method for classifying and attributing patients to specialties. Thus, flaws in USNWR's method for attributing patients to a particular specialty will produce inaccurate assessments of hospital outcomes for that specialty. *See* Timothy Lyon, Ugochukwu Ugwuowo & Benjamin Pollock, *Missing the Mark? U.S. News & World Report Urology Specialty Rankings Do Not Assess the Majority of Urologic* Care, 211 Journal *of Urology* No. 3, 469–471 (2023);[4] *see also id.* at 471, Gary W. Chien, Editorial Comment ("Lyon et al applied their institutional data using USNWR criteria and found some jaw-dropping results. A mere 4.6% of their patient encounters are used

---

[4]Available at:
https://www.auajournals.org/doi/pdf/10.1097/JU.0000000000003795.

to represent 89% of the outcomes score, and 74% of the mortalities attributed to urology measures did not occur on the urology service. The scoring algorithm favors inpatient, older, Medicare patients, and is not reflective of health care's move to outpatient and virtual care.").

For example, *Amici Curiae* discovered significant inaccuracies in the USNWR mortality and discharge to home measures for patients being admitted or treated for urologic conditions at UCLA from January 2019 through December 2022. *See supra*, Huen et al., *Patient Misattribution Influences US News and World Report Ranking Metrics* at 626. Their study showed that USNWR's methodology for evaluating urology outcomes produced a significantly distorted image of (i) UCLA's annual discharge to home rates from urology in 2019 and 2021, and (ii) the number of patient deaths attributed to urology care over 2019-2022.[5] *Id.* These distortions are primarily caused by USNWR's method for

---

[5] *See* Huen et al., *Patient Misattribution Influences US News and World Report Ranking Metrics* at 626 ("Annual discharge to home rates were significantly lower in the USNWR group when compared with rates in the primary urology group for calendar years 2019 (87% [133/153] vs. 95% [303/317], p<.001) and 2021 (89% [153/172] vs. 94% [291/309], p=0.04) while for 2020 the difference in rates were not statistically significant…. Thirteen patient deaths were attributed to urology care in the USNWR group over 2019-2022. At chart review, four deaths (31%) were related to a urology procedure; five (38%) were unrelated to an incidental urology procedure, and four (31%) were unrelated to the urology service nor procedure. In comparison, we identified three patient deaths in the same time period in the primary urology group, with all three (100%) related to the urology procedure.").

assigning patients to a hospital's urology service and its reliance on Medicare Severity Diagnosis-Related Groups ("MS-DRGs"). Although their study only examined urology specifically, USNWR relies on MS-DRGs across the board. There is no reason to doubt that this method for patient attribution results in similar distortions when evaluating outcomes for other specialties. *See* Kaitlin Fraizer, Christine Gourin, Mathew Stewart, *Fatally Flawed—Making Sense of US News & World Report Mortality Scores*, 147 JAMA Otolaryngol Head Neck Surg. No. 4 (2021);[6] Ankur Shah, Ryan Carey, Jason A. Brant, Gregory E. Tasian, Justin B. Ziemba, *An Analysis of the US News & World Report Methodology for Attribution of Specialty Care in Otolaryngology and Urology*, 164 Otolaryngology–Head and Neck Surgery No. 2 (2020).[7]

### 2. USNWR's Methodology for Assessing Quality of Care Reflects and Perpetuates Racial Inequities in Healthcare.

On the surface, USNWR's ranking methodology appears racially neutral, but a thorough review of the metrics it relies on to generate its specialty rankings demonstrates that the rankings perpetuate racial inequities in healthcare. This is evidenced by the valuations that USNWR places on certain conditions which are of differing importance to different demographics.

---

[6] Available at: https://jamanetwork.com/journals/jamaotolaryngology/article-abstract/2775611#google_vignette.

[7] Available at: https://journals.sagepub.com/doi/abs/10.1177/0194599820941016.

Take, for example, Cystic Fibrosis, which primarily affects white children, and Sickle Cell Disease, which primarily affects black children. *See* Madeline Wozniak & Chinenyenwa Mpamaugo, *It's Time For US Hospitals To Withdraw From The US News And World Report Rankings*, Health Affairs Forefront, (Mar. 17, 2023).[8]  Both are inherited diseases with devastating effects on the life and health of those afflicted. *Id.*  However, Cystic Fibrosis affects 35,000 people in the US, whereas Sickle Cell Disease is more common, affecting nearly three times as many people, and is the reason for more than 40 times as many hospitalizations. *Id.*  Another critical difference between the two conditions is their prevalence in white and black communities.  Cystic Fibrosis affects one in 3,500 white Americans, and one in 17,000 black Americans, while Sickle Cell Disease affects one in 365 black American newborns and is rare enough among white American newborns that the Centers for Disease Control and Prevention does not report a prevalence rate. *Id.*; *see also* Centers for Disease Control and Prevention, Data & Statistics on Sickle Cell Disease," https://www.cdc.gov/sickle-cell/data/?CDC_AAref_Val=https://www.cdc.gov/ncbddd/sicklecell/data.html (last visited Aug. 1, 2024).

---

[8] Available at:  https://www.healthaffairs.org/content/forefront/s-time-us-hospitals-withdraw-us-news-and-world-report-rankings#comment-6141927742.

Despite impacting more people in the U.S. and causing more hospitalizations, Sickle Cell Disease is barely represented in USNWR's pediatric hospital rankings, especially compared to Cystic Fibrosis. Cystic Fibrosis is identified as one of USNWR's "serious conditions" with a rated expertise; it is listed under the pulmonology subspecialty rankings, where, of the total 42 achievable points for that subspeciality, 19 are dedicated to "success in managing cystic fibrosis patients." Wozniak & Mpamaugo, *supra*, *It's Time For US Hospitals To Withdraw From The US News And World Report Rankings*, Health Affairs Forefront. On the other hand, hospitals can earn only one point for having a formal outpatient sickle cell program, but there is no specific hematology subsection, and success in managing Sickle Cell Disease patients does not factor into any of USNWR's specialty rankings. *Id.*

The most recent editions of the pediatric hospital rankings have added an equity, diversity, and inclusion section ("EDI"), which account for about two percent of a hospital's total points. Wozniak & Mpamaugo, *supra*, *It's Time For US Hospitals To Withdraw From The US News And World Report Rankings*. However, earning these points does not indicate that a hospital provides equitable care for people of all racial and ethnic backgrounds. Many of the achievable points come from data that has long been recorded by hospital systems: information about parents and families such as race, ethnicity, and sex. *Id.* Hospitals can also earn

points if hospital leadership has undergone EDI training. *Id*. But these EDI metrics do not fully address the quality of care provided to patients who are Black, Indigenous, or People of Color nor evaluate the outcomes of said EDI training. Training leadership on the importance of EDI is a necessary step for education and institutional culture change, but evaluating how that training affects the care provided to patients is a necessary next step.

### C.   The City Attorney's Subpoenas Serve a Vital Public Interest.

As explained above, there are apparent inaccuracies in the methodology USNWR employs for its hospital rankings which rely on flawed data sets and have puzzling valuations of certain procedures. These inaccuracies, if confirmed, indicate that the rankings may not be reliable indicators of quality of care for consumers. For example, it is clear that the rankings are not a good resource for black Americans since they do not value a condition which is of significant concern to that community and do not utilize metrics that provide insight as to whether particular hospitals provide good quality care to people of color or have effective EDI programs.

The rankings, as USNWR itself observes, play a significant role in the American healthcare ecosystem as a primary resource that consumers consult when choosing a hospital for treatment. However, its methodology is opaque such that it is nearly impossible to understand how its reaches its results, despite the

substantial resources that hospitals expend trying to do so. There is a significant public interest in understanding the rankings so that consumers and hospitals can accord them the proper weight. *See Rivera v. First DataBank, Inc.*, 187 Cal. App. 4th 709, 716 (Ct. App. 2010) (noting that "matters of health … are undeniably of interest to the public" (internal quotation marks omitted); *Brown v. Crandall*, 198 Cal. App. 4th 1, 14 (Ct. App. 2011) ("The ability to obtain necessary medical care is as basic human need"). This is especially true given that USNWR may have undisclosed financial relationships with the very hospitals that it ranks.

*Amici Curiae* are only five doctors whose primary objective is to provide good quality care to their patients. All they can do is hypothesize and attempt to replicate USNWR's rankings. The City Attorney, however, has a responsibility to ensure that consumers in San Francisco and California are provided truthful and accurate information in making healthcare decisions. In contrast to *Amici Curiae*, he is endowed with unique powers under California law to investigate violations of the UCL to protect the public from unfair, unlawful, and deceptive business acts or practices. *See* Cal. Bus. & Prof. Code § 17208. Case law demonstrates that his issuance of subpoenas in this instance is in the public interest. *See Connecticut Indem. Co. v. Superior Court*, 3 P.3d 868, 874 (Cal. 2000) (upholding city's use of subpoena power against potentially responsible parties for groundwater pollution given "the city's interest in the context of its effort to address complex funding and

lawmaking decisions in order to respond to a continuing threat to the local environment and public health, safety, and welfare"); *Kirchmeyer v. Helios Psychiatry Inc.*, 89 Cal. App. 5th 352, 360 (Ct. App. 2023) (explaining that the state Medical Board "was undoubtedly authorized to issue the investigative subpoena to fulfill its mandate to protect public health and safety").

Courts have found a substantial public interest in similar instances of information gathering. In *Iloh v. Regents of University of California*, 94 Cal. App. 5th 947 (Ct. App. 2023), an organization reporting on scientific academic accountability issued a California Public Records Act ("CPRA") request to a university regarding a professor after academic journals retracted several articles she had written. *Id*. at 951. The professor tried to prevent the university from complying with the request, causing the Center for Scientific Integrity to move to strike under California's Anti-SLAPP law.[9] *Id*. The Court held that the organization's CPRA request was protected activity in the public interest. *Id*. at 957 ("Because [the organization] issued the CPRA records request as part of its

---

[9] The court also denied the professor's motion for preliminary injunction because "'There is a strong public interest in knowing how a public university funded largely by taxpayer dollars handles and resolves quality or integrity problems in its professors' publications" because "(1) public funds are used both to pay UCI assistant professors like Iloh and also to investigate alleged academic dishonesty, (2) academic research culminating in publication is central to UCI's public function and within Iloh's job duties, and (3) the public has an interest in understanding how UCI addresses allegations of academic dishonesty.'" *Iloh*, 94 Cal. App. at 975.

newsgathering efforts, the records request qualifies as protected activity. [¶]

Further, the documents sought in the CPRA records request concerned 'an issue of

public interest.'") The circumstances here are similar. The City Attorney, by way

of subpoenas, is seeking information regarding the methodology and integrity of

USNWR's hospital rankings, which are generally viewed as indicative of quality

of care and relied on by consumers. USNWR is attempting to block the subpoenas

through litigation. However, as explained above, requests for information, like the

City Attorney's subpoenas and the CPRA request in *Iloh*, are protected activity in

the public interest.

On appeal, USNWR, relying in part on *Vargas v. City of Salinas*, 205 P.3d

207 (Cal. 2009), argues that the fact the subpoenas involve government action

means that they are not protected under California's Anti-SLAPP law. Dkt. 11.1 at

55–57. It suggests that investigations are not "protected activity. *Id*. at 57.

However, *Blue v. Office of Inspector General*, 23 Cal. App. 5th 138 (Ct. App.

2018) is directly on point. There, correctional officers and their union sought to

enjoin the California Office of the Inspector General from issuing a report about

conditions in a prison. *Id*. at 146. Their action was based on the contention that

the Inspector General had violated the correctional officers' statutory rights during

investigatory interviews leading to the report. *Id*. at 147. The Inspector General

moved to strike the correctional officers' action, and the Court of Appeal agreed.

20

It explained that government actors had the same rights under California's Anti-SLAPP law as private individuals and the press. *Id.* at 153. It then explicitly held that under *Vargas*, it does not matter that the correctional officers were not challenging the issuance of the report but "information gathering":

> [B]ecause such conduct 'would fall within the scope of the statute if [engaged in] by a private individual or entity' (*Vargas, supra, at p. 17, 92 Cal.Rptr.3d 286, 205 P.3d 207*), the fact defendants are instead governmental entities does not strip them of the statute's protection. Nor are we persuaded the mandatory duty of the Inspector General to undertake the review of High Desert State Prison upon receipt of the Senate's request vitiates the statute's protection.

*Id.* at 156. The same result would of course be true here with respect to the City Attorney's subpoenas.

The City Attorney's subpoenas and associated investigation of USNWR's methodology provide a path toward demanding accuracy and accountability from USNWR. Allowing the subpoenas and investigation to continue will help health systems and consumers make more informed choices about how to obtain necessary medical care. This Court should not impede the City Attorney's efforts to understand the methods that USNWR utilizes to ensure that the company's representations are not deceptive or otherwise impermissible. *See U.S. v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) ("law enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the

public interest"); *Craib v. Bulmash*, 777 P.2d 1120, 1124 (Cal. 1989) ("As regulatory schemes have become increasingly important in enforcing laws designed to protect the public's health and welfare, reliance on 'probable cause' as a means of restraining agency subpoena power has all but disappeared."); *Reich v. Montana Sulphur & Chemical Co.*, 32 F.3d 440, 444 (9th Cir. 1994) (explaining that an agency "'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not'" (quoting *Morton Salt Co.*, 338 U.S. at 642-43)).

## III.   CONCLUSION

The District Court did not err in denying USNWR's requested preliminary injunction and dismissing its action. *Amici Curiae* urge this Court to affirm and allow the City Attorney to continue his investigation.

DATED: August 19, 2024

Respectfully submitted,

By: /s/Imran M. Dar

IMRAN M. DAR
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
(415) 848-7200
ahartinger@publiclawgroup.com

Counsel for *Amici Curiae* Doctors and
Medical Professionals

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**: 24-2829

The undersigned attorney or self-represented party states the following:

[x] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:**  /s/*Imran M. Dar*             **Date:** August 19, 2024

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s):** 24-2829

I am the attorney or self-represented party.

**This brief contains 4,940 words,** excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** _/s/ Imran M. Dar_        **Date:** August 19, 2024